UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Perkins, et al,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>Halas, et al,<br><br>　　　　　　　Defendants. | Civil No. 3:18-cv-01081-MEG<br><br><br><br>March 4, 2025 |

**BENCH RULING**

Plaintiff Yvonne Perkins alleges that Defendants Melissa Morrill and Jim Antonelli, both officers of the Danbury Police Department ("DPD"), deprived her of her rights under the Fourth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983 ("Section 1983"). ECF No. 32, at 8-9. Plaintiff initially alleged numerous claims against various DPD officers. *Id*. They eventually moved for summary judgment, *see* ECF No. 39, which the Court granted on all counts except for the pending claim against Defendants, *see* ECF No. 50, at 1, 11-14. Plaintiff and Defendants consented to U.S. Magistrate Judge jurisdiction on December 9, 2024, and the case was transferred to me. ECF Nos. 73, 76.

The claim arises out of the DPD's investigation of Plaintiff's bail bond business, Moore Bail Bonds, LLC ("MBB"). ECF No. 50, at 2. On June 2, 2016, DPD officers other than Defendants arrested two MBB employees while they were driving Plaintiff's car, without Plaintiff present. *Id*. at 3. Afterwards, Defendants looked through the car and inventoried its contents absent a warrant to do so. *Id*. at 4. At issue is whether such conduct constitutes an unreasonable search, as Plaintiff argues, or a valid vehicle inventory, as Defendants argue. *Id*. at 11; *see also*

1

ECF No. 82, at 4.  I held a bench trial on January 17, 2025, at which Plaintiff and Defendants each testified.  ECF No. 93.  I have summarized their testimony and the exhibits admitted at trial as necessary to support my findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).

For the reasons that follow, I enter judgment in favor of **DEFENDANTS**.

## I. Findings of Fact

### A. The MBB Arrests

The DPD began investigating MBB for allegedly misappropriating bond collateral in January 2015.  ECF No. 50, at 2.  In connection with that investigation, DPD officers other than Defendants arrested MBB employees Dameisha Moore and Michael Baptiste on June 2, 2016, pursuant to a lawful arrest warrant.  *Id*. at 3.

The officers had observed Ms. Moore driving on Padanaram Road, in Danbury, in a car that was owned by Plaintiff.  *Id*. at 3-4; *see also* Trial Tr. at 35-36, 64-66.  Mr. Baptiste was the only passenger.  *Id*.  The officers stopped the car and directed Ms. Moore to park it at a nearby CVS parking lot, where they subsequently made the arrests.  *Id*.  The officers then took custody of Plaintiff's car and made arrangements for it to be towed to an impoundment lot.[1]  *Id*.; *see also* Defs.' Ex. 507.  Neither Plaintiff nor Defendants were present during these arrests.  ECF No. 50, at 3; *see also* Trial Tr. at 35-36, 64-66.

### B. Defendants' Arrival

Defendant Morrill arrived at the CVS parking lot soon after Ms. Moore and Mr. Baptiste were arrested.  Trial Tr. at 35.  The other officers informed Defendant Morrill that a tow truck

---

[1] Despite her focus on this issue at trial, the Court has already determined that Plaintiff "[does] not allege a claim regarding the towing of her vehicle . . . nor is there evidence in the record that [Defendants] were involved in the decision to impound the vehicle or had reason to know that the decision was [allegedly] unlawful."  ECF No. 50, at 14 n. 8.

2

would soon arrive to remove Plaintiff's car, so she decided to inventory its contents. *Id*. at 36, 43-44, 70; *see also* Defs.' Ex. 505. Defendant Morrill testified that she based her decision on the DPD's standardized procedures for vehicle inventories. Trial Tr. at 42.

Defendant Morrill looked through the "front compartment," then the "backseat," then the "trunk" of Plaintiff's car for any items "of value," and listed such items on a DPD vehicle inventory form. *Id*. at 44, 47-50; *see also* Defs.' Ex. 506. She eventually discovered a "plastic shopping bag full of money" by the front passenger seat and called Defendant Antonelli, her supervisor at the time, for assistance. *Id*. When he arrived at the parking lot, he decided to assist Defendant Morrill by counting the "thousands of dollars" found in Plaintiff's car, so that the exact amount could be recorded on the inventory form. *Id*. at 70-71, 88. Defendant Antonelli testified that he based his decision on the DPD's standardized procedures for vehicle inventories. *Id*. at 70-71, 74.

### C. Plaintiff's Arrival

As she drove from Padanaram Road to the CVS parking lot, Ms. Moore used her cell phone to inform Plaintiff of her impending arrest. Trial Tr. at 6. Plaintiff was unaware that the DPD would arrange to tow her car to an impoundment lot, so she attempted to retrieve it. *Id*. at 6, 13-14. When Plaintiff arrived, Defendants were still inventorying the car's contents. *Id*. at 6, 45-46, 82-83. "All the doors were open, including the trunk, and [Defendant Morrill was] going through [her] car." *Id*. at 6. Defendant Antonelli was counting her money. *Id*. at 70-71. Plaintiff began "crying" because she believed that Defendants were unlawfully searching her car and seizing her property. *Id*. at 9-12.

Upon confirming that Plaintiff was indeed the car's owner, Defendant Antonelli stopped counting Plaintiff's money, and Defendant Morrill stopped looking through her car. *Id*. at 22, 45-46, 71-73, 82-84; *see also* Defs.' Exs. 505, 506. They returned to Plaintiff all of the car's contents

(except for a purse, which belonged to Ms. Moore) and drew a diagonal line through the vehicle inventory form to indicate that the valuables listed therein had been returned. Trial Tr. at 11, 22, 46, 49, 72-73; *see also* Defs.' Ex. 506. Defendants both testified that they decided to discontinue the inventory based on the DPD's standardized procedures for vehicle inventories. Trial Tr. at 42, 70-71, 74; *see also* Defs.' Ex. 505.

### D. The DPD's Procedures

A police department's standardized procedures for vehicle inventories consist of its written policies and routine practices. *See United States v. Williams*, 930 F.3d 44, 54 (2d Cir. 2019) (citing *United States v. Thompson*, 29 F.3d 62, 65-66 (2d Cir. 1994)).

The DPD's vehicle inventory policy, Gen. Ord. 1600 § III(D)(5)(e) (the "General Order"), states that "a vehicle inventory shall be done whenever an officer causes a vehicle to be towed," such as "whenever the operator of a motor vehicle is taken into custody." Defs.' Ex. 501, at 2. It directs officers to "check all areas of the vehicle where it would be reasonable to expect personal property to be found." *Id*. Although a vehicle inventory "may lead to the inadvertent discovery of contraband and/or evidence," its stated purpose is "not to . . . gather evidence in lieu of a search warrant," but to "protect[] an arrested person's property" while they are detained and defend the DPD from "claims that property has been stolen, lost, or damage." *Id*.

In practice, DPD officers are "taught" and "required" to inventory a vehicle "every time" an officer causes it to be towed and its owner is absent or otherwise unable to take possession of its contents. Trial Tr. at 36-40, 54, 66-67, 71, 73-74. Defendant Morrill testified that, "if there is no owner present of [a] vehicle, then [I] will . . . do a vehicle inventory every time," but "if a vehicle owner is present, then, obviously, [I] don't need to do [an] inventory because [I] can turn the property over to that person." *Id*. at 39. Similarly, Defendant Antonelli testified that the

4

General Order applies "whenever a vehicle is going to be towed from the scene," including "whe[n] the vehicle owner is not present [and] the people in the vehicle are not able to drive the vehicle." *Id*. at 66, 67.

DPD officers are also required, in practice, to list any "valuables" they find during a vehicle inventory on a vehicle inventory form. *Id.* at 49-50, 86-87. Defendant Morrill testified that she typically looks through the "front compartment driver's side, [then the] passenger's side" when performing vehicle inventories, "just checking to make sure that there is nothing of value." *Id*. at 37. "If there's something of value," she will "document it on the sheet." *Id*. Defendant Antonelli testified that he is "only quickly looking if there's any valuables" and "log[ging] all the valuable items" on a vehicle inventory form when he performs vehicle inventories. *Id*. at 86-87.

Defendants offered a copy of the General Order, Defendant Morrill's incident report, and the vehicle inventory form from June 2, 2016, among other things, to corroborate their testimony. Defs.' Exs. 501, 505, 506. Plaintiff did not offer any exhibits or testimony of her own to counter Defendants' characterization of the DPD's standardized procedures. *See* Trial Tr. at 19-21.

**II.     Conclusions of Law**

   **A.  Legal Standard**

Section 1983 makes liable for damages (1) a "person" who, (2) "acting under color of state law," has (3) "deprived a person of their rights, privileges, or immunities secured by the Constitution or laws of the United States," including the Fourth Amendment. *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (internal citation omitted). "Plaintiff must prove all three of these elements by a preponderance of the evidence" for me to "find the Defendants liable for a violation of Section 1983." *Guivas v. Merullo*, No. 3:96-CV-2524 (EBB), 1998 WL 422914, at *3 (D. Conn. July 23, 1998), *adhered to on reconsideration*, 1998 WL 774231 (D. Conn. Aug. 21, 1998).

5

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend IV. "At [its] very core stands the right of a [person] to . . . be free from unreasonable governmental intrusion," including warrantless attempts by police officers to "observe" criminal conduct and "relate at [a] subsequent criminal trial what was seen." *Silverman v. United States*, 365 U.S. 505, 511 (1961); *see also Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (concluding that the validity of searches "for the purpose of investigating criminal conduct" depends on "the application of the probable-cause and warrant requirements of the Fourth Amendment"). Accordingly, warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is the vehicle inventory.

"The Supreme Court has long recognized that when police 'take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct.'" *Williams*, 930 F.3d at 53 (quoting *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008)). That is because police officers perform vehicle inventories not to "detect crime or to serve criminal prosecutions," but to "protect the owner's property while [her vehicle] is in police custody," "protect the police against spurious claims of lost or stolen property," and "protect the police from potential danger." *Lopez*, 547 F.3d at 369 (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976); *Bertine*, 479 U.S. at 372).

Courts also recognize the "danger" posed to the core privacy interests protected by the Fourth Amendment "by allowing police officers to conduct warrantless investigative searches" of

6

vehicles. *Williams*, 930 F.3d at 54-55 (acknowledging the potential for vehicle inventories to become "a purposeful and general means of discovering evidence of crime") (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). For this reason, vehicle inventories must be performed according to "standardized procedures" that "safeguard" such privacy interests by denying "officers . . . so much latitude as to whether, when, and how to search [a vehicle] that inventory searches, in practice, become a purposeful and general means of discovering evidence of crime." *Id*. (internal quotation marks omitted); *see also Bertine*, 479 U.S. at 372 (Blackmun, J., concurring) ("underscore[ing] the importance" of "standardized police procedures" because "the underlying rationale for allowing an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of the inventory search").

Nevertheless, "[not] every detail of [a vehicle inventory] must be governed by a standardized policy." *Lopez*, 547 F.3d at 371 (offering as examples "the order in which different parts of the car are searched . . . whether officers performing the search need to report the results on a standardized form . . . whether the search should be conducted by the officers responsible for the impoundment decision . . . [and] whether insignificant items of little or no value must be explicitly itemized"); *see also Wells*, 495 U.S. at 4 (concluding that "there is no reason to insist that [vehicle inventories] be conducted in a totally mechanical 'all or nothing' fashion"). Allowing police officers to "exercise [their own] judgment" when performing vehicle inventories "does not violate the Fourth Amendment" so long as they do so in good faith—in other words, "based on concerns related to the purposes of an inventory search," *see Wells*, 495 U.S. at 4, and not for "the sole purpose of investigat[ing]" criminal conduct, *see Bertine*, 479 U.S. at 372. At the very least, however, a police department's standardized procedures "should be designed to produce an inventory." *Wells*, 495 U.S. at 4.

### B. Discussion

Defendants admit that each of them is a "person" who was "acting under color of state law" at all times relevant to the pending claim. ECF No. 33, ¶ 5. The outcome of this case therefore depends on whether the DPD's standardized procedures for vehicle inventories adequately safeguard the privacy interests protected by the Fourth Amendment, and—if so—whether Defendants followed such procedures *vis-à-vis* Plaintiff's car.[2]

"A police department's standardized procedures may be established at trial by written rules and regulations," in this case, the General Order, "or by testimony regarding the department's standard practices." *Williams*, 930 F.3d at 54 (citing *Thompson*, 29 F.3d at 65-66). In *United States v. Williams*, the U.S. Court of Appeals for the Second Circuit held that the New York City Police Department's ("NYPD") standardized procedures for vehicle inventories were adequate to safeguard the privacy interests protected by the Fourth Amendment. *Id.* at 55-57. The Second Circuit did so because the NYPD's written policy "states that [the] purpose" of a vehicle inventory is to "protect property" and "ensure against unwarranted claims of theft," and because NYPD detectives "testified" that they perform vehicle inventories "to serve this purpose." *Id.* at 57 (internal quotation marks omitted).

Here, too, the DPD's stated purpose for vehicle inventories is protecting property and preventing claims of theft, loss, and property damage. Defs.' Ex. 501, at 2. The General Order

---

[2] Defendants previously asserted qualified immunity. ECF No. 39-1, at 5-7, 15-16. "Where properly asserted, qualified immunity bars claims for violations of constitutional rights unless (1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct." *Murphy v. Hughson*, 82 F.4th 177, 184 (2d Cir. 2023) (internal citation and quotation marks omitted). I asked Defendants about qualified immunity at the final pre-trial conference, and they stipulated that the Court had disposed of the issue at summary judgment. ECF No. 88. Regardless of whether that is true, Defendants chose to proceed on the merits at trial.

requires officers to look through the "areas of [a] vehicle where it would be reasonable to expect personal property to be found" anytime "an officer causes a vehicle to be towed." *Id.* Defendants testified, just as the detectives did in *Williams*, that they perform vehicle inventories "to safeguard the owner's property when the owner is not on scene," pursuant to the General Order. Trial Tr. at 36, 67, 79, 86-87. They "check[]" for items of value, and they "log" such items on a vehicle inventory form. *Id.* at 36-40, 54, 66-68, 71-74, 79, 86-87. Based on such evidence, I conclude that the DPD's standardized procedures are adequate to safeguard against vehicle inventories becoming "a general means of discovering evidence of crime." *Williams*, 930 F.3d at 55 (internal citation and quotation marks omitted).

Defendants testified that they "did their best to adhere" to the standardized procedures *vis-à-vis* Plaintiff's car. Trial Tr. at 42, 55, 70-71, 74. Defendant Morrill only looked in areas where she expected to find items "of value." *Id.* at 44, 47-50. Defendant Antonelli only opened the "plastic shopping bag full of money" so that he could "log" the exact amount on a vehicle inventory form. *Id.* at 44, 70-71, 87. Neither was "manipulating" the car, "looking for anything" in particular, or "taking apart items," as they typically would during an investigative search. *Id.* at 37, 67, 87. Based on such evidence, I conclude that Defendants followed the DPD's standardized procedures when they inventoried the contents of Plaintiff's car.

Plaintiff argues that Defendants unreasonably deviated from the standardized procedures—and thereby deprived her of her Fourth Amendment rights—when they discontinued the inventory before they had finished looking through her trunk and counting all of her money. *Id.* at 82-84. The General Order does not provide for discontinuing a vehicle inventory, nor did Defendants testify that they routinely do so. Defs.' Ex. 501, at 2.

When a police department's standard procedures do not account for some aspect of a vehicle inventory, it is reasonable under the Fourth Amendment for officers to "exercise [their own] judgment," so long as it is "based on concerns related to the purposes of an inventory search," *see Wells*, 495 U.S. at 4, and not for "the sole purpose of investigat[ing]" criminal conduct, *see Bertine*, 479 U.S. at 372. In *Williams*, the Second Circuit held that NYPD detectives "did not run afoul" of the Fourth Amendment when they inventoried a car twice, even though the "[NYPD's] Patrol Guide is silent as to the validity of multiple searches." 930 F.3d at 55. The detectives testified that they did so because the plaintiff "caused [them] to surmise" that there was "something of value inside" that they had not noticed during the initial inventory. *Id*. Accordingly, the Second Circuit concluded that they performed the second inventory based on the Patrol Guide's stated purpose for vehicle inventories, "secur[ing] . . . property" and "protect[ing] the police from claims of theft." *Id*. at 55, 57.

Defendants likewise testified that they discontinued the inventory of Plaintiff's car based on the DPD's stated purpose for vehicle inventories, protecting property and preventing claims of property damage against the DPD. *See* Defs.' Ex. 1, at 2. Defendant Antonelli stopped counting Plaintiff's money when Plaintiff arrived at the CVS parking lot because vehicle inventories are only necessary "to safeguard [an] owner's property when the owner is not on scene." Trial Tr. at 79. Defendant Morrill stopped looking through Plaintiff's car only after learning that its "owner [was] present" and able to secure its contents for herself. *Id*. at 39, 42. Plaintiff did not offer any evidence or testimony of her own to suggest that Defendants based their conduct on "an investigatory motive," or otherwise acted in bad faith. *United States v. Leeper*, 577 F. Supp. 3d 48, 65 (N.D.N.Y. 2021) (finding that police officers exercised their judgment in good faith because, among other things, their conduct did not "increase the odds of finding evidence," but rather

decreased such odds). Accordingly, I conclude that Defendants discontinued the inventory of Plaintiff's car "based on concerns related to the purposes of an inventory search" and, therefore, that they did not do so unreasonably. *Wells*, 495 U.S. at 4.

### III. Conclusion

For these reasons, I find that Plaintiff has failed to prove her Section 1983 claim by a preponderance of the evidence, and I enter judgment in favor of **DEFENDANTS**.[3]

This is not a recommended ruling. The parties consented to proceed before a U.S. Magistrate Judge, including for trial, the entry of a final judgment, and all post-trial proceedings, with appeal to the Second Circuit. ECF No. 76.

SO ORDERED.

/s/ Maria E. Garcia, USMJ
Hon. Maria E. Garcia
United States Magistrate Judge

---

[3] Plaintiff's primary argument seems to be that the Supreme Court is not justified in exempting vehicle inventories from the Fourth Amendment's warrant and probable-cause requirements. *See* Trial Tr. at 12 ("I felt . . . powerless to watch them go through my things and say that it was legal, even though everything in my body said that it wasn't [legal], that this is not right"). She is not alone in making this argument. *See, e.g.*, *Opperman*, 428 U.S. at 395-396 (Marshall, J., dissenting) (exempting vehicle inventories "elevates the conservation of property interests . . . above the privacy and security interests protected by the Fourth Amendment"); *Cooper v. State of Cal.*, 386 U.S. 58, 65 (1967) (Douglas, J., dissenting) (exempting vehicle inventories "water[s] down" the Fourth Amendment); *see also* Tonja Jacobi & Elliot Louthen, *The Corrosive Effect of Inevitable Discovery on the Fourth Amendment*, 171 U. Pa. L. Rev. 1, 45, 47 (2022) (arguing that the Supreme Court "has emphasized that an essential feature of inventory searches is constraint of officer discretion, as [police] must follow 'standardized criteria' . . . yet, in circular fashion, the Court has simultaneously deferred to [police] to preestablish these standardized protocols . . . this means that the Court has enabled police to create their own rules that are then enshrined as the purported contours of the exception"). Salient as it may be, it does not affect my findings of fact and conclusions of law. *See, e.g., Williams*, 930 F.3d at 53 (affirming and adopting the vehicle inventory exception for the Second Circuit).